# Illinois Official Reports

## Appellate Court

---

### *People v. Lengyel*, 2015 IL App (1st) 131022

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEVEN LENGYEL, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-13-1022 |
| Filed | August 5, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-2715; the Hon. Michael Brown, Judge, presiding. |
| Judgment | Reversed and remanded for resentencing. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Peter Sgro, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Kathleen Warnick, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant Steven Lengyel and his father Richard Lengyel got into a verbal argument that escalated into a physical altercation. Steven punched Richard, and, two days later, Richard died at the hospital after suffering a stroke. The State charged Steven with first degree murder. The jury convicted Steven of second degree murder, and he was sentenced to 18 years in prison.

¶ 2        On appeal, Steven argues: (1) the State failed to prove him guilty of second degree murder beyond a reasonable doubt because he did not have the requisite intent or knowledge for murder but instead, he committed involuntary manslaughter by recklessly punching Richard; (2) ineffective assistance of counsel for his trial attorney's alleged failure to present the defense of involuntary manslaughter; and (3) the trial court abused its discretion in sentencing him to 18 years' imprisonment.

¶ 3        Based on the evidence that Steven acted recklessly and without the intent to kill Richard, he should have been convicted of involuntary manslaughter, not second degree murder. Accordingly, we reverse Steven's second degree murder conviction, enter a conviction for involuntary manslaughter, and remand for resentencing.

¶ 4                                    BACKGROUND

¶ 5        Steven Lengyel was 22 years old and living with his father, Richard Lengyel, in a one-bedroom apartment on the north side of Chicago. Unemployed, Steven took care of Richard, who received disability benefits stemming from his diabetes. Steven took care of Richard by shopping for him, taking him to dialysis, and managing his finances. Steven and Richard argued daily over things like cigarettes, DVDs, and car parts.

¶ 6        On January 3, 2012, Steven was in the bedroom with his girlfriend, Alexandra Cort, when he decided to go to the living room and talk to Richard about a pizza menu. Steven and Richard got into a verbal, and then a physical, altercation, after which Richard was taken to the hospital where he died two days later following a stroke.

¶ 7        On January 4, Steven voluntarily surrendered to police and, while Richard was still alive, was charged with aggravated battery. He gave videotaped statements to detectives on January 4 and January 5.

¶ 8        Steven told detectives that he had issues with his father and his inner rage against Richard had been building for years. He was frustrated that "[Richard] wouldn't let me get my shit and leave." He also said, "I'm not proud of what happened at all."

¶ 9        On the day of the fight, Steven asked Richard about a pizza menu, and Richard accused him of stealing a lighter. Steven then went to his room and started going through his DVDs, and noticed that some were missing. He asked his father if he knew where the DVDs were, and then Steven and Richard began arguing over the DVDs and other grievances.

¶ 10        As the argument escalated, Richard, who was sitting in his recliner, grabbed Steven's shirt. To disentangle himself, Steven punched Richard in the head four or five times. Steven acknowledged that he hit his father but said Richard touched him first, and he was only trying to get away from Richard. Steven said he paused for a second after the first contact, then continued. Steven stopped as soon as he saw Richard was bleeding. Steven denied

hitting Richard in the back or chest, explaining that Richard fell a couple months earlier, which could account for the broken ribs and bruising on Richard's back.

¶ 11    After Steven saw the blood, he went back to his bedroom, locked the door, and told Cort that they needed to leave the apartment. Richard then broke through the bedroom door. Steven pushed him out and Richard fell down to his hands and knees. Richard got up on his own and went to the kitchen to get a towel. At Richard's request, Steven called for an ambulance. He told the operator that Richard had fallen and needed help. Steven did not wait for the ambulance to arrive; Richard told him to leave before the paramedics got there.

¶ 12    Steven and Cort left the apartment and went to a friend's apartment. Steven told his friend that he and his father had gotten into a fight, and that Richard had again blamed him for stealing his things. Steven called his mother because he was worried about his father and wanted to know if Richard was okay. Eventually, Steven and Cort went back to the apartment to gather some clothes and DVDs to pawn, and spent the night at Cort's apartment. The next morning, Steven agreed to meet with detectives at a McDonald's. Meanwhile, Richard was in the hospital in critical condition.

¶ 13    Following Richard's death, Steven was charged by indictment with two counts of first degree murder. Count I alleged that Steven intentionally or knowingly beat, struck, and killed Richard with his hands (720 ILCS 5/9-1(a)(1) (West 2012)), and count II alleged that Steven struck and killed Richard with his hands, knowing that such acts created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2012)).

¶ 14    At trial, Carol Lengyel, Richard's sister, testified that on January 5, Richard was taken off of life support and died. At the time of his death, Richard was 55-years-old and the father of two children, Steven and Tiffany.

¶ 15    Steven's girlfriend, Alexandra Cort, testified that she was in the apartment during the fight. For most of the day, Cort and Steven were cleaning the bedroom and watching movies, while Richard stayed in the living room. At about 5:00 p.m., Steven found a pizza menu in the bedroom and went to ask Richard if he wanted to keep it. Cort stayed in the bedroom. She heard Richard ask Steven where his lighter was, and then she heard arguing, which escalated to yelling, over who owned the lighter and the DVDs.

¶ 16    According to Cort, Steven felt Richard was a bad father and never around. Richard countered that Steven had been a horrible son, refused to pay rent, and would not go to school. Steven accused Richard of getting high. Cort did not see what was happening because it "sounded like every other fight [Richard and Steven] had." After ten minutes, Steven ran back into the bedroom and locked the door. Steven said that they had to leave because he had just hit his father. Steven appeared worried, scared, and angry. She saw a rip in his shirt.

¶ 17    Steven's in-court testimony largely follows his videotaped statements to the police. Steven testified that after he approached his father with the pizza menu, Richard accused him of stealing a lighter. Steven went to the bedroom, and after about 15 to 20 minutes went back to speak with his father after noticing some of his DVDs were missing. Richard was sitting in the recliner. Steven asked Richard if he knew the whereabouts of the DVDs, after which he and Richard began yelling at one another. Steven said he was angry but did not want to kill Richard.

¶ 18    As the argument escalated, Richard got up from the recliner and grabbed Steven's shirt with both hands. Steven walked Richard back to the recliner because he was worried that

Richard might fall. Richard repeatedly stood and fell back into his recliner. Unable to pull away because Richard would not let go of his shirt, Steven hit his father.

¶ 19    Steven testified to hitting Richard in the head four or five times. He stopped after he noticed blood on the fourth or fifth strike. Steven's shirt ripped when he was finally able to free himself from his father's grasp. Steven went into the bedroom and locked the door.

¶ 20    A few minutes later, Richard broke down the bedroom door and entered yelling and swearing at Steven, ordering him to leave the apartment, and stating he wished Steven was never born. Steven responded by pushing Richard in his chest, causing Richard to fall down to his hands and knees. Richard was talking and crying, but he did not look like he was injured.

¶ 21    While Richard lay on the floor, Steven yelled that Richard was a horrible father. Richard told Steven to call 911, which Steven did. Richard got up on his own and walked into the kitchen to get a towel for his head, then sat down in his recliner and told Steven and Cort to leave. They gathered some belongings and left before the ambulance arrived.

¶ 22    Cort and Steven went to their friend Tabish Dean's place. Dean testified that Steven told him, "I just beat up my dad." Steven also said Richard was pushing him more and more, and that was "the last straw." Steven did not say he killed or wanted to kill his father, but that he hit Richard to get away from him. After a few hours, Steven and Cort left to retrieve their personal belongings at the apartment.

¶ 23    Steven and Cort knew that Richard was in the emergency room. Steven thought his father would need some stitches. Steven told Cort that he could not stay with Richard anymore, and would sell all of his DVDs and video games to live on his own. After receiving a call from detectives, Steven turned himself into the police.

¶ 24    Chicago Police Officer George Scoufis testified that when he arrived at the apartment paramedics were administering first aid. Richard told Scoufis, "my son beat me up." Scoufis asked Richard how and where he had been hit. Richard replied, "[Steven] used his fists" and "struck [him] about the head and the face." Richard said Steven did not use any weapons and never mentioned that he had been hit anywhere else on his body. Scoufis observed a small amount of blood about Richard's head. After the paramedics transported Richard to the hospital, Scoufis attempted to interview Richard but Richard could not speak and was slipping in and out of consciousness. About two and half hours later, Scoufis learned that doctors assessed Richard's condition as critical.

¶ 25    Chicago Police Detective Michelle Wood testified that the day after the altercation, she contacted Steven and met him at a McDonald's. Detective Wood arrested Steven for aggravated domestic battery and transported him to the Area 3 Detective Division. Detective Wood and Detective John Korolis informed Steven of his *Miranda* rights. Steven agreed to be interviewed. The police videotaped the interviews, which took place on January 4, and January 5, the day Richard died.

¶ 26    Detective Wood testified that after Richard's death, she executed a search warrant for the apartment and recovered Steven's ripped shirt with Richard's blood on it.

¶ 27    Dr. Lauren Woertz of the Cook County Medical Examiner's office performed Richard's autopsy. She attributed Richard's death to a stroke due to an increase in blood pressure caused by stress from injuries. She said the blunt force trauma to the head, in and of itself, did not cause the stroke. Most of the injuries were on Richard's scalp, a laceration on the top

of the scalp and some bruising on the scalp and forehead. She found diffuse bruising on the left side of the body, a diffuse bruise on the left side of the back, and scrapes on the knees and legs.

¶ 28 Dr. Woertz saw bleeding in the brain, which was consistent with a stroke. Richard had some fractures of the spine as well as multiple rib fractures but no skull fractures. She believed that all of the injuries had been incurred recently and the rib and spinal fractures likely happened at the same time. She also indicated that Richard had many health problems in addition to the diabetes, including peripheral vascular disease, diverticulosis, kidney disease, heart disease, and high blood pressure. In addition, Richard had a previous stroke. The urine drug screen performed by the hospital indicated the presence of opiates. Dr. Woertz stated these underlying natural diseases weakened Richard's body and that it takes less insult on this type of person to cause a potentially catastrophic effect than on a healthy person.

¶ 29 Over the State's objection, the court granted Steven a second degree murder instruction based on an unreasonable belief in self-defense.

¶ 30 The jury convicted Steven of second degree murder. The defense filed a motion for a new trial, which the trial court denied. At sentencing, Steven received 18 years in prison. The defense filed a motion to reconsider the sentence, which the trial court denied as well.

¶ 31                                   ANALYSIS

¶ 32 Steven raises three issues for review: (1) whether the State proved him guilty of second degree murder beyond a reasonable doubt; (2) whether his counsel was ineffective for failing to present an involuntary manslaughter defense; and (3) whether the trial court exercised appropriate discretion in imposing the 18 year sentence.

¶ 33                         Sufficiency of the Evidence

¶ 34 Steven challenges the sufficiency of the evidence, arguing the State failed to prove beyond a reasonable doubt that he had the requisite intent or knowledge for second degree murder. Rather, Steven contends, he committed involuntary manslaughter by recklessly punching his father.

¶ 35                           Standard of Review

¶ 36 The due process clause protects an accused against conviction absent proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Brown*, 2013 IL 114196, ¶ 48. When a defendant challenges the sufficiency of the evidence, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brown*, 2013 IL 114196, ¶ 48.

¶ 37 A reviewing court may set aside a criminal conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). A court of review will not retry a defendant when considering a challenge to the sufficiency of the evidence. *People v. Smith*, 185 Ill. 2d

532, 541 (1999). While we give deference to a fact finder's decision to accept testimony, the fact finder's decision is neither conclusive nor binding. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 38                                    Second Degree Murder Conviction

¶ 39    Steven was charged with two counts of first degree murder under sections 9-1(a)(1) and (a)(2) of the Criminal Code of 1961 (720 ILCS 5/9-1(a)(1), (a)(2) (West 2012)). First degree murder occurs when a person kills another person without lawful justification and, in performing the acts that cause the death:

        "(1) he [or she] either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

        (2) he [or she] knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1 (West 2012).

¶ 40    First degree and second degree murder share the same elements. *People v. Flemming*, 2015 IL App (1st) 111925, ¶ 53. The difference between the two is that second degree murder involves the presence of a mitigating factor, such as serious provocation or an unreasonable belief in justification. *Id*.

¶ 41    At trial, Steven requested an instruction on second degree murder based on an unreasonable belief in self-defense. The State objected, arguing that the evidence did not show Steven subjectively believed a danger existed. The trial court gave the instruction over the objection. Because the jury found Steven guilty of second degree murder, they must necessarily have concluded that the State proved the elements of first degree murder, and Steven proved by a preponderance of the evidence a mitigating factor sufficient to reduce the offense to second degree murder. We observe that the self-defense strategy was ill conceived. Steven never claimed that he believed a danger existed and that the amount of force he used was necessary to avert any danger. Steven testified he hit Richard to get away, not because he felt his physical safety was threatened or to avoid any imminent danger of harm. Defense counsel should not have pursued this strategy at the expense of an involuntary manslaughter instruction.

¶ 42                                              Intent

¶ 43    Steven contends that the State did not prove that he killed his father intentionally or knowingly, but at most, recklessly. Thus, his conviction should be reduced to involuntary manslaughter.

¶ 44    The difference between first degree murder and involuntary manslaughter involves the mental state that accompanies the conduct resulting in the victim's death. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). Involuntary manslaughter requires less culpability than first degree murder. *Id*. Involuntary manslaughter occurs when a person's actions are "likely to cause death or great bodily harm to some individual, and he [or she] performs them recklessly." 720 ILCS 5/9-3(a) (West 2012).

¶ 45    A person acts recklessly "when [he or she] consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow." 720 ILCS 5/4-6 (West 2012). In contrast, to act intentionally, the person must possess the conscious objective or purpose to accomplish that result and, to act knowingly, the person must possess the

conscious awareness of his or her conduct being practically certain to cause that result. 720 ILCS 5/4-4, 4-5(b) (West 2012).

¶ 46                                                Intentionally

¶ 47        First, Steven argues he did not intentionally kill his father. He points out that he called an ambulance at Richard's insistence, and his father was alert and conscious when he left. Often, a mental state can be inferred from the character of the defendant's acts and the circumstances surrounding the commission of the offense. *People v. Jones*, 175 Ill. 2d 126, 133 (1997). The surrounding circumstances include the character of the defendant's acts and the nature and seriousness of the victim's injuries. *People v. Castillo*, 2012 IL App (1st) 110668, ¶ 52.

¶ 48        Steven, citing *People v. Mitchell*, 105 Ill. 2d 1, 9-10 (1984), asserts that intent also can be inferred from a defendant's actions immediately after a crime. In *Mitchell*, our supreme court found that the defendant mother did not intend to kill her 16-month-old daughter because, after repeatedly striking her until she was unconscious, the mother could have completed the crime if that had been her intention. *Id*. Instead, the mother ultimately took her daughter to the hospital. *Id*. As in *Mitchell*, after he struck his father, Steven called for an ambulance almost immediately, indicated concern for his father's condition, and told the police consistently that he was angry with Richard, but was not trying to kill him. Considering all of the circumstances surrounding the fight, the proof fails to establish beyond a reasonable doubt that Steven intended to kill his father.

¶ 49                                                Knowingly

¶ 50        Next, Steven argues that he did not knowingly kill his father, citing (1) the fight's brevity, (2) the limited number of punches (four or five), and (3) the cause of death being attributed to a stroke and not directly to his having struck Richard.

¶ 51        To the first point, Steven refers to the long-standing principle in Illinois that death is not normally a reasonable or probable consequence of a barehanded blow. *People v. Brackett*, 117 Ill. 2d 170, 180 (1987); *People v. Crenshaw*, 298 Ill. 412, 416-17 (1921); *People v. Gresham*, 78 Ill. App. 3d 1003, 1007 (1979). While the intentional use of a deadly weapon presumes that the individual knows his or her acts create a strong probability of death or great bodily harm, generally, no similar presumption accompanies a fist fight. *Id.*

¶ 52        The State contends that despite this principle, the disparity in size and strength between Steven and Richard negates it and shows Steven acted with the knowledge that death or great bodily harm was the practically certain outcome. *Brackett*, 117 Ill. 2d at 180. In *Brackett*, during the course of an evening, the defendant raped and beat the victim with his bare fists. *Id*. at 173. The supreme court found that the disparity in size and strength between the 21-year-old male defendant, who was six feet three inches tall and 175 pounds, and the 85-year-old female victim, was sufficient to support the finding that he knew his acts created a strong probability of death or great bodily harm. *Id*. at 179-80.

¶ 53        Unlike the victim and defendant in *Brackett*, the record shows that Richard and Steven were similar in size. Richard was six feet two inches in height, and weighed 240 pounds and Steven was six foot one inch in height, and weighed 220 pounds. Although Richard had multiple health problems, he had enough strength after the fight to break open the locked

bedroom door. Richard was conscious, coherent, and ambulatory when Steven left. Furthermore, unlike in *Brackett*, this was not an hours-long rape and beating. The physical altercation lasted a matter of minutes. Steven did not use a weapon and stopped punching as soon as he saw blood.

¶ 54 To the second point, Steven contends that because the punches did not directly cause the death, he could not be practically certain that his actions would cause death or great bodily harm. In *People v. Tainter*, 304 Ill. App. 3d 847, 851 (1999), for example, the court held the victim's death from a bacterial infection related to a broken jaw after an assault warranted an instruction on the lesser included offense of involuntary manslaughter. The court reasoned that due to the "unusual final cause of death," a jury might find that the defendant did not know the beating created a strong probability of great bodily harm. *Id*. Similarly, Steven's punches did not directly cause Richard's death, and a jury could find that Steven did not know that his actions created a strong probability of great bodily harm.

¶ 55 Thus, where Steven punched Richard solely with his fists and where those punches did not directly cause death, the proof fails to sufficiently establish beyond a reasonable doubt that Steven knowingly killed his father.

¶ 56                                    Involuntary Manslaughter

¶ 57 Steven argues that the evidence supports giving an involuntary manslaughter instruction because a reasonable jury could find his acts were reckless.

¶ 58 To determine whether a defendant's conduct reveals sufficient recklessness to warrant a jury instruction on involuntary manslaughter, we consider: (1) the disparity in size between the defendant and the victim; (2) the brutality and duration of the beating, and the severity of the victim's injuries; and (3) whether the defendant used his or her bare fists or a weapon. *People v. DiVincenzo*, 183 Ill. 2d 239, 251 (1998). Our supreme court cautioned that "an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly." *Id*.

¶ 59 Steven focuses on the short time of the physical altercation and the lack of a weapon. He contends a tense argument escalated when Richard grabbed his shirt and would not let go, and he stopped as soon as he saw blood. Thus, at most, Steven contends that he acted recklessly by disregarding the risk the punches could lead to a spike in blood pressure, which could eventually lead to a stroke.

¶ 60 The State counters that taking all the factors into account, they militate against a finding of recklessness. First, the State argues that there was a significant disparity in age, strength, and health. Second, the nature of the incident and severity of the injuries do not support a conclusion of reckless behavior. Richard's autopsy revealed lacerations on the top of his scalp, bruising on his forehead and on the left side of his back, scrapes on the right forearm and hand, two scrapes and a pink bruise on his right knee, and a scrape on his left leg. Richard also had bleeding in the brain consistent with a stroke, bleeding on the surface of the brain, swelling of the brain, and rib and spinal fractures.

¶ 61 Finally, the State cites *People v. Viramontes* in support of the contention that the extent of Richard's injuries belies a mental state of recklessness. In *Viramontes*, the defendant husband was convicted of first degree murder in the fatal beating of his wife following the

discovery of her infidelity. *People v. Viramontes*, 2014 IL App (1st) 130075, ¶ 1. The defendant argued that the trial court erred in denying an involuntary manslaughter instruction where he threw his wife against the refrigerator and wall, did not use a weapon, did not strangle his wife, and did not engage in acts known to kill. *Id*. ¶ 64. This court held that the trial court properly denied an involuntary manslaughter instruction holding the evidence did not support a finding of recklessness based on the disparity in size and strength of the parties and the nature and extent of the victim's injuries. *Id*. ¶ 65.

¶ 62    But in *Viramontes*, the severe and gruesome nature and extent of the wife's injuries transcended the nature and extent of Richard's injuries. The wife's autopsy revealed 27 external evidences of injury, and a subdural hemorrhage to the skull and cerebral edema to the brain. Richard's autopsy revealed that he did not have a hemorrhage to the skull or a cerebral edema. In fact, the physical violence Viramontes inflicted on his wife was significantly more brutal than the exchange between Steven and his father. Viramontes did not merely hit his wife a few times about the head; he threw his wife against the door, tossed her over a table, and threw her into the refrigerator and then onto the floor, each time causing her to hit her head. And, when his wife retreated into the fetal position on the floor, he hit her in the face with his hands. In contrast, Steven punched his father four or five times. In addition, Viramontes initiated the physical altercation, while here, Richard instigated the fight by grabbing onto Steven's shirt.

¶ 63    Finally, the disparity in size and strength between Viramontes and his wife was far greater than the disparity in size and strength between Steven and Richard. Viramontes weighed 30 pounds more than his wife, and admitted that he was stronger. Steven and Richard were about the same height and weight. Although Richard had health problems and was older, he still had enough strength to break a locked bedroom door. Thus, unlike Richard's injuries, the wife's injuries were inconsistent with a mental state of recklessness.

¶ 64    Taking all the factors into consideration, the proof sufficiently shows Steven recklessly punched Richard. The weaponless fight involved individuals of the same general size and strength. Steven was in a tense argument with his father that escalated when Richard grabbed his shirt and would not let go. Steven stopped punching when he saw blood and called the ambulance soon after. When the paramedics arrived, Richard was conscious and responsive. Accordingly, Steven acted recklessly by disregarding the risk that the punches could lead to a spike in blood pressure, which eventually led to a stroke. Thus, we find that Steven's actions constituted involuntary manslaughter, not second degree murder, and remand for resentencing.

¶ 65    Because we are reducing Steven's conviction to involuntary manslaughter based on the lack of evidence establishing second degree murder, we need not address his ineffective assistance of counsel argument.

¶ 66                                              Sentencing

¶ 67    We also need not address Steven's argument that the trial court abused its discretion in sentencing him to 18 years in prison, close to the maximum for second degree murder, given his age, his remorsefulness, and his lack of a prior criminal history. We remand and ask the trial court to hold a new sentencing hearing based on involuntary manslaughter.

¶ 68                                CONCLUSION

¶ 69       We find that the evidence presented at trial, considered in the light most favorable to the
prosecution, shows that Steven Lengyel acted recklessly and that his actions constituted
involuntary manslaughter, not second degree murder. Therefore, under Illinois Supreme
Court Rule 615(b)(3) (eff. Jan. 1, 1967), we reduce Lengyel's conviction of second degree
murder to involuntary manslaughter and remand to the circuit court for resentencing.

¶ 70       Reversed and remanded for resentencing.