2020 IL App (2d) 170955-U
No. 2-17-0955
Order filed June 23, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-922 |
| DANIEL RAK, | ) ) | Honorable Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Jorgensen and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The State proved defendant guilty beyond a reasonable doubt of aggravated domestic battery causing great bodily harm, as the jury could reasonably conclude that defendant broke the victim's nose and did so knowingly; where defendant admitted striking the victim but the jury heard conflicting evidence of the cause of the victim's death, the jury was not confused and did not enter inconsistent verdicts when it acquitted defendant of first-degree murder and involuntary manslaughter.

¶ 2    Defendant, Daniel Rak, appeals from his conviction, following a jury trial, of aggravated domestic battery (720 ILCS 5/12-3.3 (West 2016)), arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Defendant concedes that he struck his father, Jeffrey Rak, but he argues that the State failed to prove that he acted knowingly or that he caused Jeffrey's

nasal fractures. He also argues that the jury's questions during deliberations indicated confusion, resulting in inconsistent verdicts. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In February 2016, defendant was living with his girlfriend, Brittani Decker, and Jeffrey in Jeffrey's large two-story house. On Thursday, February 11, 2016, defendant struck Jeffrey twice on the nose, after learning that Jeffrey had walked in on Decker while she was bathing. In the early morning hours of Sunday, February 14, 2016, defendant found Jeffrey lying dead on the floor in Jeffrey's bedroom. The official cause of death was "subdural hematoma due to blunt force trauma due to altercation."

¶ 5      On July 19, 2016, defendant was indicted on one count of first-degree murder (*id.* § 9-1(a)(2)) and one count of aggravated domestic battery (*id.* § 12-3.3). The murder count alleged that, on or about February 11-14, 2016, "defendant[,] without lawful justification, repeatedly struck Jeffrey Rak's head, knowing usch [*sic*] acts created a strong probability of death or great bodily harm to Jeffrey Rak, thereby causing the death of Jeffery [*sic*] Rak." The aggravated-domestic-battery count alleged that, on or about February 11, 2016, defendant "knowingly caused great bodily harm to Jeffrey Rak, a family member of the defendant, in that said defendant struck Jeffery [*sic*] Rak in the face and in so doing, fractured Jeffrey Rak's nose."

¶ 6      The following evidence was presented at defendant's jury trial. Kane County sheriff's deputy Michael Flanery testified that, at about 3:30 a.m. on February 14, 2016, he was dispatched to a home in rural Sycamore. When he arrived, he encountered defendant and Decker, who were sitting inside on the stairs. Flanery entered a bedroom on the first floor and saw Jeffrey, lying dead, and paramedics, who were packing up their equipment. Jeffrey had two black eyes and a red substance running from his nose. While waiting for detectives to arrive, Flanery spoke with

defendant and Decker. Defendant was crying and distraught; he also vomited several times. Defendant told Flanery "that he had gotten into a fight with his dad two days prior" and that "he had punched his dad in the face." Defendant stated that he felt sick and asked Flanery to speak with Decker. Flanery spoke with Decker in the kitchen, while defendant remained on the stairs. Two deputies arrived, and defendant and Decker accompanied them to the sheriff's office.

¶ 7     Decker testified that, on Thursday, February 11, 2016, she arrived home at about 6 or 7 p.m. After speaking with defendant for a few minutes, she went to take a bath in the second-floor bathroom. She did not close the bathroom door, because Jeffrey never went upstairs. While she was in the bathtub, Jeffrey entered the bathroom and asked her if she had received his text asking her to "get more booze and cigarettes." She told him that she had picked up the items he wanted and that she would bring them downstairs when she was done. She asked him to leave the bathroom. He continued talking to her and asked about marks on her legs. She again asked him to leave the bathroom. She testified that she was extremely uncomfortable, upset, mad, and embarrassed. When she finished her bath, she handed defendant a glass vodka bottle and cigarettes and asked defendant to take them items to Jeffrey. Decker was crying and embarrassed. Defendant asked her what was wrong, and she told him what Jeffrey had done.

¶ 8     Decker testified that she remained upstairs while defendant carried the vodka and cigarettes to Jeffrey's bedroom at the bottom of the stairs. Decker heard defendant say, "why would you do that," "why did you go in there," "why didn't you yell for her," "why didn't you knock." Defendant's "voice was raised," but he was not "yelling." She heard Jeffrey say, "she's like my daughter." Defendant returned upstairs after a couple of minutes. Defendant apologized to Decker and asked if she was okay. Defendant told her that he had "hit" Jeffrey and that he "might have broke his nose." He also told her that "[h]e hurt his hand." Defendant told Decker that he was

going downstairs to check on Jeffrey and asked if she wanted to go. Decker declined because she still did not want to see Jeffrey. Defendant checked on Jeffrey "numerous times that same night."

¶ 9    Decker testified that, the next day, defendant told her that Jeffrey wanted to speak with her. As she was leaving the house, she and defendant stopped in Jeffrey's room. When counsel asked Decker to describe Jeffrey's face, Decker pointed to the area "on the bridge of [her] nose across the eyes" and testified that it "was swollen." She also "believe[d]" that that there was a little blood coming from his nose. She stated that there was "dry blood." She spoke with Jeffrey and left the house. When she returned in the early evening, she found defendant and Jeffrey in Jeffrey's room, laying together and watching television. She thought that they "both had probably been drinking a little bit," but not "how Jeff was the night before." They were "together happy, getting along great." She spoke with them for a couple minutes and then went upstairs "to give them time to hang out together alone." Defendant joined her upstairs shortly thereafter.

¶ 10    Decker testified further that, on Saturday morning, Jeffrey sent her a text message requesting cigarettes. She brought cigarettes downstairs, placed them on the staircase railing, and sent Jeffrey a text saying where they were. When she left the house for the day, the cigarettes were gone. When she returned on Saturday evening, she walked by Jeffrey's room and saw that the door was open slightly. She heard the television and thought she heard him snoring. She testified that, at some point, she and defendant discussed whether Jeffrey should go to the hospital. Decker testified that they "both asked [Jeffrey] repeatedly and he said, no, I'm fine, I'm fine." Defendant told her that he might get in trouble, because "they had gotten into a fight." They did not call 911 on Saturday night. Eventually, they both went to sleep.

¶ 11    Decker testified that defendant woke her at about 3:45 a.m. Sunday, saying "there's something wrong with my dad." She called 911, as she followed defendant downstairs. When she

entered Jeffrey's bedroom, she saw him lying on the floor. Defendant started CPR. Decker thought that Jeffrey was not breathing. When the paramedics arrived, she and defendant sat on the steps. Decker identified various photographs taken of the home.

¶ 12    On cross-examination, Decker testified that she uses heroin "[o]n and off" and that she was using heroin while living in Jeffrey's house. She testified further that, on Friday night, after she had seen defendant with Jeffrey and after defendant had joined her upstairs, she went downstairs and saw Jeffrey on the floor next to his bed "[w]here [they] found him constantly." She said that he was always falling out of bed. She testified: "And like, so I go upstairs and I get [defendant] and [defendant] comes down like he always did and picks him up like a kid, like one arm behind his neck and the other behind his knees like you were carrying a kid and he picks him up and he puts him back in bed like he did every day." Decker testified that, although Jeffrey was awake, he could not get up on his own. She testified further that Jeffrey had lost control of his bladder, which happened "often." She stated that when Jeffrey had an accident, defendant would clean him and change his clothes. Defendant told her that they needed to convince Jeffrey to go to the doctor and that he did not care if he got in trouble. Defendant never asked Decker to hide anything from the police.

¶ 13    Kane County sheriff's detectives Nathan Moravec and Raul Salinas interviewed defendant at the sheriff's office on the morning of Sunday, February 14, 2016. A video recording and transcript of the interrogation were admitted at trial and played for the jury. At 6:20 a.m., Moravec began recording the interrogation room where defendant was being held, but he did not enter because Salinas had not yet arrived. At about 7:16 a.m., defendant knocked on the door and said he wanted to speak with someone. Moravec opened the door and told defendant that he was waiting for someone else to arrive. Defendant put his head down on the table and said "that he had had a

fight with his father, bopped him in the nose." Moravec told defendant that he would speak with him after his partner arrived.

¶ 14    At 7:28 a.m., Moravec and Salinas entered the room and spoke with defendant. Defendant told the detectives that he was 30 years old and had lived with his dad for five or six years. He explained that he and Decker lived upstairs and that Jeffrey lived on the first floor. Defendant said that Jeffrey would often get drunk and fall down. He said that he was constantly finding Jeffrey on the ground. Defendant explained that, on Thursday, Jeffrey had been drinking and went upstairs to ask Decker to get him alcohol. Jeffrey saw Decker in the bathtub and asked her about the marks on her legs, which upset her. Defendant said that he "got, sort of, upset." He went to Jeffrey's bedroom and "yelled at him." He asked Jeffrey, " 'What the hell are you doing?' " He told the officers that he was "screaming at him, and then [he] just got more pissed 'cause [Jeffrey] was talking about seeing her legs." Defendant stated that he threw a bottle that might have bounced off Jeffrey's face. He said that Jeffrey grabbed him and that he pushed Jeffrey and struck him in the face. He said that they "tussled a little bit" and that he "bopped [Jeffrey] in the nose.' Defendant said that Jeffrey was sitting on the bed, leaning back on pillows, and that he hit Jeffrey "[m]aybe twice." Jeffrey said, "Oh. You hurt my nose." Jeffrey's nose was bleeding "[p]retty decent" after defendant struck him. Defendant stated: "I guess I hit him in the nose really good." Defendant denied hitting Jeffrey with a bottle but stated "I definitely punched him in the face." Defendant was asked if he had anything in his hand when he hit Jeffrey and defendant replied, "Nothing but my fist."

¶ 15    The video recording showed defendant sitting, hunched over, and leaning on a table. He held up his head with his right hand. Defendant was asked what he meant when he said that he "bopped" Jeffrey in the nose, and with his bent right arm still leaning on the table, defendant

shaped his right hand into a loose fist and brought it toward his left shoulder. Defendant then swung his right hand downward and to the right, leading with the outer edge of his hand and keeping his hand in a loose fist. He repeated this motion twice, stating "I hit him like that." He said that Jeffrey was on the bed and he was standing over him. Defendant demonstrated the same motion later in the interview and stated, "but harder than that."

¶ 16    Defendant told the detectives that he spoke with Jeffrey the next morning. He brought him some water and told him why Decker was upset. Jeffrey still had blood on him and was holding a rag. Defendant asked him if he was sure that he was okay. Jeffrey told defendant that he thought that defendant broke his nose. Jeffrey told him that he went in the bathroom and "set it." Defendant stated that he asked Jeffrey if he wanted to see a doctor, but Jeffrey replied that he was fine. Defendant knew that Jeffrey was taking warfarin, a blood thinner, so he was worried that "he was having trouble clotting 'cause he said he's had trouble clotting before." Jeffrey's "eyes were a little swollen but his nose was, like, really red." They had a good conversation and told each other that they loved each other. Defendant said they spoke for about an hour and a half. Defendant told him to text him if he needed anything. Defendant went back upstairs. Defendant told the detectives that he spent all day Friday in bed. Decker left for work on Saturday around 3 p.m. Defendant could not recall if he had seen Jeffrey on Saturday.

¶ 17    Salinas testified that defendant was arrested on June 3, 2006, after Salinas received a copy of the autopsy and neuropathologist report. On cross-examination, Salinas testified that he attended the autopsy, which was completed on February 14, 2016. Salinas was asked whether he was told that Decker and defendant claimed to not have seen bruising around Jeffrey's eyes "as late as the morning of Saturday, February 13th, 2016." He stated: "They told me he had swelling," but he

explained that it "could be mistaken for bruising." When shown "a picture of bruising," defendant stated that Jeffrey "didn't have that when I saw him this morning."

¶ 18    Dr. James Filkins, an expert in forensic pathology, performed the autopsy on Jeffrey. Filkins observed 35 bruises of various sizes and colors, which he stated was common for alcoholics, who tend to stumble and fall. Jeffrey also had a broken nose and "black eyes around each eye." He explained that "if you break your nose without your eyes being hit because of the way the blood vessels run in that part of the face and head, there can also be blood leaking out and puffing up the eyes to give the appearance of black eyes." When asked how quickly that reaction might appear, he stated "[t]hat might happen instantly. It might take a little while to develop, a few minutes or so, but something like that would come on, I think fairly soon." He testified further: "The swelling would come on as the blood is—from the broken nose is beginning to leak into the tissue around the eyes." When viewing a photograph of Jeffrey's face, People's exhibit No. 25B, Filkins pointed out "[t]he red discoloration around the eyes." He also pointed out the "deviation or alteration in the configuration of [Jeffrey's] nose and that there is some bruising up near the bridge of the nose between the bridge of the nose and the inner part of his right eye. These are indicative of the fracture to the nose that he had."

¶ 19    Filkins testified that when he examined Jeffrey's internal organs, "the principal internal injury was a subdural hematoma in [Jeffrey's] skull," which he explained was bleeding on the surface of the brain but under the "tough fibrous tissue called the dura." According to Filkins, because the blood he observed had the consistency of "jelly," he opined that the subdural hematoma was "not fresh."

¶ 20    Filkins submitted Jeffrey's brain to Dr. Marc Reyes, an expert in neuropathology, who examined the brain and prepared a report. After reviewing Reyes' report, Filkins determined that

the cause of death was a "subdural hematoma due to blunt head trauma due to an altercation." He obtained information about the blunt force trauma and altercation from "investigative sources." Filkins testified that "a forceful blow from an adult that lands in the right spot can" break someone's nose. Filkins reviewed Jeffrey's toxicology report and testified that it did not reveal any other possible causes of death. Filkins agreed that "the timing of this subdural hematoma, based on both [his] findings and Doctor Reyes' finding, [was] consistent with a blow to the nose that may have occurred on February 11, Thursday, before [Jeffrey] was found deceased on February 14th." Thereafter, the following colloquy occurred:

"Q. So earlier, before you testified, I asked you about the bruises on his body below his shoulders. So, in your opinion, did any of those bruises that you saw cause the subdural hematoma in the victim's head?

A. Well, I think I testified that some of them could have, but what I can say to a reasonable degree of medical certainty is that if [Jeffrey] was struck a blow to his nose with sufficient force to cause the fractures that I identified, that blow would absolutely have enough force to cause a bleed or a re-bleed.

So some of the other bruises might represent a fall or a trip and maybe if that was hard enough or bad enough fall or trip, maybe that could have shaken things up and caused a re-bleed, maybe, maybe not. We don't know.

I mean, obviously, [Jeffrey] tended to drink and fall and stumble so we don't really know. But whatever caused the broken nose was absolutely of sufficient force to cause the subdural bleeding or re-bleeding.

Q. And the best evidence you have of what caused that subdural hematoma and broken nose?

A Absolutely."

¶ 21　On cross-examination, Filkins testified that he did not recall the police telling him that defendant and Decker claimed to not have seen any bruising on Jeffrey's eyes for at least the next 30 hours after defendant struck Jeffrey. Filkins testified that the absence of bruising could "[p]ossibly" be the result of a "backhand slap that is hard enough to cause a nosebleed but doesn't cause any fractures." He testified further that he did not think that "a backhand slap, even if it is done by an adult and it is done forcefully, could break bones in the nose." Filkins opined that Jeffrey died about 12 hours before defendant found him. Filkins agreed that Jeffrey's broken nose and bruising could be consistent with Jeffrey walking into the bathroom, falling, and striking his face on the toilet five or six hours before he died. He testified: "In this case, it's also my opinion that the altercation and the blow to the nose is what caused the subdural to bleed or re-bleed."

¶ 22　Reyes testified that he examined Jeffrey's brain and observed an older, preexisting subdural hematoma and a recent one. In his opinion, the recent subdural hematoma was the cause of Jeffrey's death. The more recent subdural hematoma was consistent with Jeffrey being struck on Thursday night. Reyes' reviewed Jeffrey's medical records and stated that he "was not a healthy individual. He had a lot of problems." He had seizures. He also developed blood clots, which were treated with warfarin.

¶ 23　On cross-examination, Reyes agreed that if he did not know the date of the altercation, he would estimate the subdural hematoma was 12 hours to 7 days old. He did not take a sample of the blood clot for testing. He stated that he did not need to narrow his estimate of the recency of the subdural hematoma because he knew when it happened.

¶ 24　Defendant presented testimony from Dr. Douglas C. Miller, an expert in anatomical pathology, pathology, and neuropathology. Miller testified that he examined the autopsy report,

photographs, and Jeffrey's medical records. Jeffrey's medical records showed that he was a chronic alcoholic who would suffer seizures when he stopped using alcohol. He suffered seizures apart from alcohol withdrawal and fell often. He was found to have a subdural hematoma in 2010. He also had been previously diagnosed with nasal fractures. He had liver disease, heart disease, emphysema, high blood pressure, and high cholesterol. He also had deep vein thrombosis and was treated with warfarin. Jeffrey was taking numerous additional medications.

¶ 25     Miller testified that he also examined a slide that Reyes had prepared. The slide contained a portion of the dura where the clot was adhering to it, and Miller testified that "the most reasonable determination" was that the subdural hematoma was five days old. If he had had the entire clot, he could have determined that it was even older than that. According to Miller, "the most reasonable probability" was that Jeffrey's injury occurred on Monday. He also testified that he was "above 50 percent" convinced that Jeffrey died of a subdural hematoma but that there was no way to rule out that he died of a sudden cardiac death or a "Sudden Unexplained Death in Epilepsy." He testified that the age of Jeffrey's nasal fracture could not be determined because sections of that tissue had not been preserved. He also testified that a histological examination of the bruised tissue around Jeffrey's eyes was not needed to conclude that Jeffrey broke his nose shortly before his death on Saturday.

¶ 26     On cross-examination, the following colloquy occurred:

          "Q. All right. So if Doctor Filkins said that he thinks the death was—could be two

          days before, the trauma was two days before the death, and Doctor Reyes says that he

          thinks that the traumatic injury that caused the subdural hematoma was on Thursday, three

          days before the death, and you agree that the trauma and the clot at this stage could be three

          days but maybe five days, those three estimates come pretty close together, correct?

A. Fairly close. They don't completely—they are not completely congruent, but they're fairly close, three to five days."

¶ 27    At the close of evidence, the State requested that the jury be instructed on involuntary manslaughter, as a lesser-included offense of first-degree murder.

¶ 28    The jury was instructed on first-degree murder, in relevant part, as follows:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First Proposition*: That the defendant performed the acts which caused the death of Jeffrey Rak and;

*Second Proposition*: That when the defendant did so, he knew that his acts created a strong probability of death or great bodily harm to Jeffrey Rak."

The jury was instructed on involuntary manslaughter, in relevant part, as follows:

"To sustain the charge of involuntary manslaughter, the State must prove the following propositions:

*First Proposition*: That the defendant performed the acts which caused the death of Jeffrey Rak; and

*Second Proposition*: That the defendant performed those acts recklessly; and

*Third Proposition*: That those acts were likely to cause death or great bodily harm."

The jury was instructed on aggravated domestic battery, in relevant part, as follows:

"To sustain the charge of aggravated domestic battery, the State must prove the following propositions:

*First Proposition*: That the defendant knowingly caused great bodily harm to Jeffrey Rak; and

*Second Proposition*: That Jeffrey Rak was then a family or household member to the defendant."

¶ 29    During deliberation, the jury sent out the following questions: "We need to get a clear definition of 'knowingly' and 'great' bodily harm to—" There was an arrow pointing from the word " 'great' " to a written remark stating, "This could be subjective." The trial court provided an additional pattern instruction for "knowingly." The court further informed the jury that "[y]ou have been given all instructions in this case."

¶ 30    The jury found defendant not guilty of first-degree murder and involuntary manslaughter, but guilty of aggravated domestic battery. Following the denial of defendant's posttrial motions, the trial court sentenced defendant to 48 months' probation.

¶ 31    This timely appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33    Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated domestic battery. More specifically, he argues that the evidence did not prove that (1) he was consciously aware that by striking Jeffrey he was practically certain to cause great bodily harm and (2) his act of striking Jeffrey was the cause of Jeffrey's nasal fractures. He also asserts that jury confusion exacerbated the evidentiary shortfalls, resulting in the guilty verdict.

¶ 34    We review sufficiency of the evidence claims to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates

a reasonable doubt of the defendant's guilt. *Id.* "[I]t is not the function of this court to retry the defendant." *Id.* The trier of fact must assess the credibility of the witnesses and the weight of their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence, and this court will not substitute its judgment for that of the trier of fact on these matters. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 35 A defendant commits aggravated domestic battery by knowingly causing great bodily harm to a family member. 720 ILCS 5/12-3.3(a) (West 2016). A defendant acts knowingly when he is consciously aware of the nature of his conduct and that his conduct is practically certain to cause a particular result. 720 ILCS 5/4-5(b) (West 2016). Because one's mental state is rarely susceptible to direct proof, whether a person acted with intent, such as knowingly, is generally established through circumstantial evidence and inferred from the defendant's conduct and the circumstances surrounding his actions. *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 44.

¶ 36 A. Sufficiency of the Evidence as to Defendant's Mental State

¶ 37 Defendant first argues that the evidence was insufficient to establish beyond a reasonable doubt that he acted with the requisite mental state, *i.e.*, that he was consciously aware that his conduct was practically certain to cause great bodily harm, where he hit Jeffrey with "a couple of backhand strikes from [his] bare hand" and "there was no disparity in Jeffrey's and [defendant's] size and strength." We hold that the evidence as to defendant's mental state was sufficient.

¶ 38 First, the jury could have reasonably concluded that the strikes to Jeffrey's face were much more serious than defendant suggests. Defendant concedes that he did not strike Jeffrey with an open hand, but he also asserts that the evidence does not support a conclusion that "his hand was tightly clenched to form a fist." In support, defendant points to his demonstration during his interrogation. To be sure, when demonstrating how he struck Jeffrey, defendant's hand was not

*tightly* closed. However, he also did not demonstrate that he struck Jeffrey with the *back* of his *open hand*. Defendant demonstrated a backhand and downward motion leading with the outer edge of his loosely closed hand, seeming to indicate that he struck defendant with the outer edge of a loose fist. Although defendant argues that, based on the demonstration, there is no evidence that defendant's hand was tightly clenched to form a fist, the jury could have found otherwise. Certainly, the jury could have found that defendant was downplaying the severity of the strikes, given that he was being questioned by the detectives. The video makes clear that, at the time defendant demonstrated the movement, defendant was tired, had vomited recently, and showed little energy. He was leaning on the table, holding his head with his hand when he first demonstrated the movement.

¶ 39    Moreover, the evidence of defendant's demeanor when he confronted Jeffrey supports a reasonable inference that he struck Jeffrey significantly harder than he suggests. Defendant admitted that he was "upset" when he learned that Jeffrey had walked in on Decker taking a bath. Defendant stated that he went to Jeffrey's bedroom, yelled at him, and threw a bottle of vodka at him. In addition, immediately after the incident, defendant told Decker that he had "hit" Jeffrey, that he "might have broke his nose," and that "[h]e hurt his hand." At the scene, defendant told Flanery that "he had punched his dad in the face." Defendant told the detectives, "I definitely punched him in the face." He also stated: "I guess I hit him in the nose really good." Indeed, at one point, while demonstrating the strike, defendant added, "but harder than that."

¶ 40    Defendant asserts that he and Jeffrey were similar in size and weight, and therefore, the jury could not have reasonably concluded that he was consciously aware that he was practically certain to cause Jeffrey great bodily harm. We disagree. Defendant cites in *People v. Lengyel*, 2015 IL App (1st) 131022, where the defendant punched the victim in the head four or five times and

the victim subsequently died of a stroke. The appellate court reduced the defendant's second-degree murder conviction to involuntary manslaughter, relying in part on evidence that the defendant and the victim were of similar size and noting that the victim, after being hit, broke down the defendant's bedroom door to confront him. Similarly, in *People v. Nibbe*, 2016 IL App (4th) 140363, the defendant approached the victim on a sidewalk and punched him in the head, causing him to fall and hit his head on the pavement, suffering a skull fracture, which caused the victim's death. The appellate court reversed the defendant's first-degree murder conviction, noting that the victim "was not substantially smaller or weaker than defendant" and that the victim "died from his head striking the concrete and not from the blow to the face." *Id.* ¶ 34.

¶ 41    *Lengyel* and *Nibbe* are easily distinguishable from this case. Here, although there might not have been a great disparity in Jeffrey's and defendant's size, the evidence established that Jeffrey suffered from numerous medical issues and was much weaker than defendant. Decker testified that Jeffrey often lost control of his bladder, fell out of bed, and could not climb back into bed. She testified that defendant "picks him up like a kid, like one arm behind his neck and the other behind his knees like you were carrying a kid and he picks him up and he puts him back in bed." Certainly, defendant was significantly stronger than Jeffrey to be able to pick him up like a child. In addition, defendant was aware that Jeffrey was taking warfarin, which caused him to bleed excessively, making him more susceptible to a serious injury when struck.

¶ 42    Viewing the evidence in a light most favorable to the State, taking into account defendant's emotional state at the time of the strikes, his own description of the strikes, and his knowledge that Jeffrey was much weaker than he was, a rational trier of fact could have found that, when defendant struck Jeffrey, he did so with the knowledge that his actions were practically certain to cause great bodily harm.

¶ 43                    B. Sufficiency of the Evidence as to Causation

¶ 44    Defendant next argues that the evidence was "too speculative and uncertain" to establish a causal connection between defendant's conduct and Jeffrey's broken nose. According to defendant, "no rational jury could reasonably exclude the possibility that the nasal fractures *** were the product of a preceding or intervening cause." We disagree.

¶ 45    The jury could have reasonably concluded that defendant caused Jeffrey's nasal fractures based on the overwhelming circumstantial evidence. There is no dispute that defendant struck Jeffrey in the nose twice on Thursday evening and, as noted, the jury could have reasonably concluded that the strikes were more serious than defendant claims. Moreover, when defendant struck Jeffrey, Jeffrey exclaimed, "You hurt my nose." Defendant described Jeffrey's nose as bleeding "[p]retty decent" after the strikes. Jeffrey told defendant the next day that he thought that defendant broke his nose and that he went into the bathroom to "set it." The jury could have reasonably relied on Jeffrey's statement that defendant had broken his nose, especially given Jeffrey's additional comment that he attempted to "set it." In addition, Filkins confirmed that Jeffrey had a broken nose, which he testified was apparent from his visual inspection of Jeffrey's body at the outset of the autopsy. The jury was shown a picture of Jeffrey's face, as Filkins pointed out "[t]he red discoloration around the eyes." He also pointed out the "deviation or alteration in the configuration of [Jeffrey's] nose and that there is some bruising up near the bridge of the nose between the bridge of the nose and the inner part of his right eye," stating that "[t]hese are indicative of the fracture to the nose that he had." Filkins also testified that "a forceful blow from an adult that lands in the right spot" could break someone's nose.

¶ 46    In addition, Decker testified that she saw Jeffrey on Friday morning and, when asked to describe Jeffrey's face, she pointed to the area "on the bridge of [her] nose across the eyes" and

testified that it "was swollen." This is consistent with Filkins' explanation that "[t]he swelling would come on as the blood is—from the broken nose is beginning to leak into the tissue around the eyes." Filkins also pointed out the "deviation or alteration of the configuration of [Jeffrey's] nose and that there is some bruising up near the bridge of the nose between the bridge of the nose and the inner part of his right eye. These are indicative of the fracture to the nose that he had." Although defendant claims that he and Decker "had not seen any bruising on Jeffrey's face for at least 30 hours after the altercation," the jury could have found otherwise. Decker saw Jeffrey on Friday morning and, as noted, her description was consistent with Filkins' description. Defendant was not clear as to when he last saw Jeffrey alive, but the evidence seems to suggest that it was also Friday morning. Although defendant stated that he did not see the bruising that was apparent in Jeffrey's photo taken at the scene, the jury could have found that defendant was downplaying the situation to explain why he failed to seek medical attention. The jury was free to reject his testimony. The jury was also free to reject defendant's theory that, because Jeffrey was prone to falling, Jeffrey suffered the injury after defendant had hit him. The jury heard no evidence that such a fall occurred.

¶ 47    Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that defendant broke Jeffrey's nose when he struck him on Thursday night.

¶ 48            C. Whether Alleged Jury Confusion Influenced the Verdicts

¶ 49    Finally, defendant argues that the jury was confused, as shown by its request for clarification as to what constitutes a knowing mental state and great bodily harm. He claims that the confusion influenced the guilty verdict and that the verdicts on the offenses were "logically inconsistent." Although defendant concedes that logically inconsistent verdicts do not *per se*

require reversal, he asserts that it is a factor to consider in determining whether defendant was found guilty beyond a reasonable doubt. See *People v. Murray*, 34 Ill. App. 3d 521, 532 (1975).

¶ 50    Defendant was found not guilty of first-degree murder and not guilty of involuntary manslaughter. A person commits first-degree murder when he kills an individual without lawful justification "if, in performing the acts which cause the death: *** he knows that [his] acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2016). A person commits involuntary manslaughter when he unintentionally kills an individual without lawful justification and "his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2016). A person commits aggravated domestic battery when he "knowingly causes great bodily harm" to a family member. 720 ILCS 5/12-3.3(a) (West 2016).

¶ 51    Defendant argues that the verdicts are logically inconsistent, because "[i]f [defendant's] act of striking Jeffrey was not at least recklessly performed and either did not cause a strong probability of great bodily harm or was not likely to cause great bodily harm, it is difficult to see how that same conduct could be knowingly performed and actually cause great bodily harm."

¶ 52    In response, the State asserts that the verdicts were not logically inconsistent because the jury could have concluded that defendant knew "that it was highly probable that his acts of striking Jeffrey Rak in the nose would inflict *great bodily harm* in the form of a broken nose but did not act knowingly or recklessly in causing the *death* of Jeffrey Rak." (Emphases in original.) The State further argues that the verdicts could have been an expression of lenity. We agree with State.

¶ 53    First, to sustain the charge of both first-degree murder and involuntary manslaughter, the jury was instructed that it was required to find, as the first proposition, that "defendant performed

the acts which caused the death of Jeffrey Rak." The jury could have concluded that the State did not prove beyond a reasonable doubt that defendant's act of striking defendant, although sufficient to establish that defendant caused great bodily harm in the form of a broken nose, was insufficient to establish that defendant caused Jeffrey's death. We reject defendant's argument that the jury could not have reasonably concluded that defendant broke Jeffrey's nose without also concluding that he caused Jeffrey's death. According to defendant, "[s]uch a finding is not only inconsistent with the theory of the case advanced by the prosecution at trial, it is also unsupported by the totality of the evidence, which established a causal connection between Jeffrey's fatal subdural hematoma and blunt force trauma sufficient to cause his nasal fractures."

¶ 54    However, defendant overlooks the testimony of his own expert, Miller, who testified that the subdural hematoma was likely five days old. Miller also testified that sudden cardiac death or "Sudden Unexplained Death in Epilepsy" could not be excluded as the cause of death. Indeed, defense counsel argued in closing argument that there was no objective evidence to establish the age of the subdural hematoma and that the opinions of the State's experts were based on when defendant struck Jeffrey. Defense counsel also argued that even Filkins acknowledged that Jeffrey "could have died of a fatal seizure" and "absolutely *** could have died of a heart attack." Defense counsel also argued that there was testimony that a subsequent injury would not make an existing subdural hematoma produce more blood. Thus, the jury could have concluded that the evidence did not prove beyond a reasonable doubt that defendant caused the subdural hematoma or, even, that a subdural hematoma was the cause of death.

¶ 55    Moreover, even if the verdicts were logically inconsistent, the jury could have been exercising its power of lenity. See *Murray*, 34 Ill. App. 3d at 536 ("The jury's historic power of lenity must prevail *** over the traditional doctrine concerning legally and logically inconsistent

verdicts.") This case is sad and unfortunate. Even if the jury believed that defendant's act of striking Jeffrey caused his death, the jury could have believed that the conviction of aggravated domestic battery provided sufficient punishment. To be sure, as noted by defendant, involuntary manslaughter is generally a Class 3 felony subject to a nonextended sentencing range of 2 to 5 years' imprisonment (see 720 ILCS 5/9-3(d)(2) (West 2016); 730 ILCS 5/5-4.5-40(a) (West 2016)), whereas aggravated domestic battery is generally a Class 2 felony subject to a nonextended sentencing range of 3 to 7 years' imprisonment (see 720 ILCS 5/12-3.3(b) (West 2016); 730 ILCS 5/5-4.5-35(a) (West 2016)). Nevertheless, this distinction would not be readily apparent to an average juror, who could rationally believe that involuntary manslaughter was the more serious offense, given that the defendant would be held accountable for the victim's death.

¶ 56    Finally, we do not agree that the jury's questions during deliberations demonstrated confusion serious enough to question the validity of its verdict. The jury asked for, and received, a definition of "knowingly." We presume that the additional definition answered the question. The jury indicated that describing "bodily harm" as "great" is subjective, but the comment did not demonstrate confusion. Indeed, whether an injury constitutes great bodily harm is a question for the trier of fact. *People v. Cisneros*, 2013 IL App (3d) 110851, ¶ 12. Here, the jury's comment implicitly recognized that great bodily harm is not susceptible to a precise legal definition (*People v. Doran*, 256 Ill. App 3d 131, 136 (1993)), and in finding defendant guilty of aggravated domestic battery, the jury agreed that the nasal fractures suffered by Jeffrey amounted to great bodily harm.

¶ 57                                III. CONCLUSION

¶ 58    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 59    Affirmed.